1

**MARK BRNOVICH**
**ATTORNEY GENERAL**

2

(Firm State Bar No. 14000)

3

Anthony R. Napolitano (State Bar No. 34586)

4

  *Assistant Attorney General*
Office of the Arizona Attorney General

5

2005 N. Central Ave.
Phoenix, Arizona 85004

6

Telephone: (602) 542-3333
Facsimile: (602) 542-8308

7

ACL@azag.gov

8

Anthony.Napolitano@azag.gov

9

*Attorneys for Defendant Mark Brnovich,*

10

*in his official capacity as Attorney General*
*of the State of Arizona*

11

12

13

**IN THE UNITED STATES DISTRICT COURT**

14

**FOR THE DISTRICT OF ARIZONA**

15

16

Puente Human Rights Movement, et al.,

No. 2:21-cv-00446-JJT

17

18

Plaintiffs,

**MOTION TO DISMISS BY MARK BRNOVICH, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF ARIZONA**

19

vs.

20

21

Mark Brnovich, in his official capacity as Attorney General of Arizona, et al.

22

23

Defendants.

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

INTRODUCTION ...................................................................................................1

3

BACKGROUND ...................................................................................................1

4

ARGUMENT .........................................................................................................3

5

I.   Plaintiffs' Allegations Fail To Satisfy Standing Requirements ................................3

6

   a.   Plaintiffs Cannot Suffer Damages From An Agreement That Was Never
Operationalized...........................................................................................4

7

   b.   Plaintiffs Have No "Legally Protected Interest" In Preventing The Attorney
General From Bringing Suits Under The APA. .............................................5

8

   c.   Plaintiffs' Alleged Injuries Are Not Traceable To The Agreement...................6

9

   d.   A Favorable Decision Here Cannot Redress Plaintiffs' Alleged Injuries
Stemming From Decisions Of Other Federal Courts .......................................9

10

11

II.   Plaintiffs' Claims Should Be Dismissed As Moot .................................................10

12

   a.   The SAFE Agreement Will Expire In Days ......................................................10

13

   b.   Plaintiffs' Claims Are Prudentially Moot..........................................................11

14

CONCLUSION.....................................................................................................12

15

16

17

18

19

20

21

22

23

24

25

26

27

i

28

# INTRODUCTION

Defendant Mark Brnovich, in his official capacity as Attorney General of the State of Arizona (the "Attorney General"), hereby moves to dismiss Plaintiffs' Complaint (Doc. 1) ("Compl.") under Federal Rule of Civil Procedure 12(b)(1). Plaintiffs' Complaint challenges the validity of the SAFE Agreement between Defendant Brnovich and Federal Defendants and alleges that it caused them injury. The SAFE Agreement, however, has never been acted upon and thus has not caused Plaintiffs any cognizable—or even conceivable—injury.  The Complaint must accordingly be dismissed for lack of Article III standing.

In particular, the SAFE Agreement has never been operationalized even once in the slightest manner. It was completely disavowed by Federal Defendants, who have never honored its terms in any manner whatsoever. As a result of Federal Defendants' prompt disavowal, the SAFE Agreement for all intents and purposes here exists only on paper.

As a result, Plaintiffs have not suffered any injury from the SAFE Agreement, since it has never been actually put into operation by Federal Defendants. Plaintiffs accordingly lack standing to bring their claims, rendering dismissal under Rule 12(b)(1) appropriate.

# BACKGROUND

On January 8, 2021, the Department of Homeland Security ("DHS") signed a Sanctuary for Americans First Enactment Agreement ("SAFE Agreement") with the Arizona Attorney General.  Ex. A; *see* Compl. at ¶ 1.  The SAFE Agreement, among other things, included an agreement by which the Attorney General's Office ("AGO") and Arizona Department of Law ("ADL") would "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult [AGO and ADL] and consider its views before taking any

1

action adopting or modifying a policy or procedure" that could affect aspects of DHS's immigration enforcement activities.  Ex. A at 2.  The SAFE Agreement also provides that "[a]ny party may terminate its involvement in this Agreement" with 180 days' written notice and such "termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier." *Id.* at 7.

Shortly after the SAFE Agreement was signed, DHS issued a January 20 memorandum modifying DHS policy, including instituting a 100-day pause in removals.  Compl. at ¶ 5.  In response, the Attorney General sent Acting DHS Secretary David Pekoske a letter on January 26, 2021, titled "Request for DHS to comply with its agreement with the Arizona Attorney General's Office before instituting 'pause on removals.'"  Ex. B.  This letter was ignored and AGO followed up via an email from Joseph Kanefield, Chief Deputy & Chief of Staff, to Acting Secretary Pekoske on February 1, 2021.  Ex. C.

On February 2, 2021, DHS through Acting Secretary Pekoske responded by letter (the "Pekoske Letter") to the Attorney General stating that "The Document between DHS and Arizona is void, not binding, and unenforceable" and "Notwithstanding that the Document is void … this letter also provides notice … that DHS, CBP, ICE, and USCIS rescinds, withdraws, and terminates the Document, effective immediately."  Ex. D.  The SAFE Agreement has thus never been operationalized, with DHS rejecting its validity and simultaneously giving notice of its termination upon the Attorney General's first attempt to utilize it.  The language of the Pekoske Letter makes clear that DHS has no intention of following the terms of the SAFE Agreement even before its 180-day termination period has expired.

Meanwhile, on January 22, 2021, the State of Texas sued DHS over the January 20 memorandum, and ultimately obtained a preliminary injunction of the 100-day pause on removals on February 23, 2021.  Compl. at ¶ 76.  The Arizona Attorney

General also filed a suit against DHS on February 3, 2021, amending that complaint on March 8, 2021, alleging that DHS's issuance of the January 20 memorandum and subsequent February 18 Interim Guidance violate the Administrative Procedure Act ("APA").  Compl. at ¶¶ 80-81.  Notably, the Attorney General's litigating position has been that the plaintiffs in that suit "are not seeking specific performance of the [SAFE Agreement]" but rather "seek a declaration that the Removal Moratorium is void, and *inter alia*, the [SAFE Agreement] establish[es] that DHS changed its removal policy, [and] did not follow proper procedure in doing so." *State of Arizona, et al. v. DHS, et al.*, 2:21-cv-00186-SRB (D. Ariz. Apr. 5, 2021), Reply in Support of Mot. for Preliminary Injunction, Doc. 38 at 16, Ex. E.  On March 10, 2021, the Attorney General joined with several other states to file a motion to intervene in an already-ongoing appeal regarding another DHS policy change to the "Public Charge Rule."  Compl. at ¶ 82. Both cases are still pending before their respective courts.

Plaintiffs filed this suit on March 16, 2021, alleging injuries from the SAFE Agreement, which was never operationalized, DHS has expressed it will not be following, and which has not been otherwise enforced—nor has its specific performance been sought—in any court.

## ARGUMENT

## I.    Plaintiffs' Allegations Fail To Satisfy Standing Requirements

Plaintiffs lack standing as they cannot point to any injury actually stemming from the implementation of the SAFE Agreement between the Attorney General and DHS.  This burden of demonstrating standing falls on Plaintiffs alone.  *Sierra Club v. U.S. E.P.A.*, 762 F.3d 971, 976 (9th Cir. 2014).  To establish standing, (1) Plaintiffs must have suffered an "injury in fact" to a "legally protected interest," (2) "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court,'" and (3) "it must be 'likely,' … that the injury will be 'redressed by a favorable decision.'" *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–43 (1976)).  Plaintiffs' claims fail to satisfy this "irreducible constitutional minimum."  *Id.*

### a. Plaintiffs Cannot Suffer Damages From An Agreement That Was Never Operationalized

As a threshold matter, Plaintiffs cannot have suffered any damages as a result of the SAFE Agreement because the agreement has never been put into operation and DHS—the only party to it capable of making the potential changes to immigration policy of which Plaintiffs complain—has expressly stated that it considers it void.  Yet the Complaint claims that "But for the unlawful SAFE Agreement and Defendant Brnovich's efforts to enforce it," Plaintiffs would not suffer the alleged injuries.  Doc. 1 at ¶¶ 93, 100, 104, 112, 113.  To the extent that Plaintiffs' allegations are that future injuries may occur, they have likewise failed to meet their burden of showing that such injury is "actual and imminent, not conjectural or hypothetical."  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (internal quotation marks omitted).

As the agreement was never operationalized, it cannot be that the agreement itself has led to any injury to Plaintiffs.  This is especially true where, as here, any obligation under the agreement was disavowed by DHS almost immediately.  And while Plaintiffs identify certain lawsuits in which the Attorney General is involved, none of these are actually seeking specific performance of the SAFE Agreement.[1]

---

[1] The Complaint identifies two cases in which the Attorney General is involved that they allege are attempts to enforce the SAFE Agreement.  Compl. at ¶¶ 80-82.  The first, *Arizona v. DHS*, brings multiple claims independent of the SAFE Agreement and does not seek enforcement of the agreement through specific performance.  *State of Arizona, et al. v. DHS, et al.*, 2:21-cv-00186-SRB (D. Ariz.), Compl. Doc. 1; and Ex. E.  The second involves an appeal that began in 2019, well before the SAFE Agreement was signed, in which the Attorney General is part of a multi-state coalition that filed a motion to intervene, and that motion to intervene does not mention the SAFE Agreement even once.  *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, No. 19-17213 (9th Cir. Mar. 10, 2021), Mot. to Intervene, ECF No. 143, Ex. F.

4

With no actual enforcement or discharge of obligation under the SAFE Agreement properly alleged in the Complaint, it follows that Plaintiffs cannot have actually been injured as they claim. Nor have Plaintiffs plausibly alleged otherwise.

### b. Plaintiffs Have No "Legally Protected Interest" In Preventing The Attorney General From Bringing Suits Under The APA.

Plaintiffs' claims are improper because they are not a party to the SAFE Agreement and "a party does not have standing to bring a declaratory judgment claim regarding rights and obligations under a contract to which it is neither a party nor a third-party beneficiary." *Tri-State Generation & Transmission Ass'n. v. BNSF Ry. Co.*, No. CV08-272-PHX-MHM, 2008 WL 2465407, at *2 (D. Ariz. June 17, 2008).  Standing requires that Plaintiffs have a "legally protected interest," yet Plaintiffs cannot establish such an interest pertaining to the SAFE Agreement as they are neither parties nor third-party beneficiaries to that agreement.  *Lujan*, 504 U.S. at 560; *cf. Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 952 (9th Cir. 2013) (legally protected interest is found where plaintiff had "an interest in receiving whatever it is guaranteed under its contracts").  With no interest in the benefits or guarantees of the SAFE Agreement upon which Plaintiffs' claims all rest, Plaintiffs cannot have standing here.

Further, Plaintiffs can assert no legal interest in preventing the Arizona Attorney General from bringing or taking part in lawsuits alleging that DHS has acted unlawfully.  The Arizona Attorney General is authorized by statute to represent the state in federal court, and may "go to the courts for protection of the rights of the people."  *State ex rel. Morrison v. Thomas*, 297 P.2d 624, 628 (Ariz. 1956); A.R.S. §§ 41-192, -193.  And the Attorney General is not himself making any of the policy changes.  *See Arizona v. U.S.*, 567 U.S. 387, 394, 416 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of

aliens" and "the State may not pursue policies that undermine federal law"). Instead, he is merely asking federal courts to adjudicate claims under federal law. Any resulting "injury" from such decisions is attributable to the federal courts, not the Attorney General—especially "since it will be the courts alone who in all such cases make the final decisions and not the Attorney General." *Morrison*, 297 P.2d at 628. Further, the Attorney General's involvement in each of the lawsuits Plaintiffs cite as causes of their alleged injuries is not limited to claims relying on the SAFE Agreement, and therefore Plaintiffs cannot plausibly maintain their key allegation that such actions would not have been taken "but for" the SAFE Agreement. *E.g.*, Compl. at ¶ 93. Plaintiffs thus have no legally protected interest in preventing the Attorney General from carrying out his statutorily-conferred duties, much less an interest in interfering with the proceedings or judgments of federal courts.

### c.  Plaintiffs' Alleged Injuries Are Not Traceable To The Agreement

Plaintiffs' alleged injuries also fail to meet the second *Lujan* factor because they are not traceable to the Agreement and caused by "the independent action of some third party not before the court." 504 U.S. at 560. Indeed, the Plaintiffs here each specify *other causes* of their injuries in the Complaint. Throughout the Complaint, Plaintiffs point to several third parties—including the courts and their own members— who are or would be the direct cause of their injuries, which makes it "substantially more difficult" for Plaintiffs to carry their burden of establishing standing as they are not the "object of the government action" being challenged. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653-654 (9th Cir. 2017) (quoting *Lujan*, 504 U.S. at 562). Plaintiff Puente notes that "[w]hen the DHS Memo went into effect, the number of calls that Puente fielded daily … dropped significantly," but "Since the DHS Memo's pause on removals was enjoined … Puente's staff have had to devote … hours to providing advice to members and their families regarding the quickly evolving status of the law

governing removals and addressing members' fear of impending removal proceedings."
Compl. at ¶¶ 87-88.  These facts clearly point to the injunction issued by the *Southern District of Texas* (*see* Compl. at ¶ 76) at the request of the Attorney General of *Texas— i.e.*, not *Arizona's* Attorney General.  State attorneys general are not interchangeable parts such that Plaintiffs can obtain redress against Texas's attorney general by suing Arizona's.

Plaintiffs pointing to the *Texas* TRO as the key element that ended the brief drop in call volume they experienced after DHS's January 20 Memorandum is thus unavailing.  So, too, is their reliance on the alleged redirection of resources "[a]s a result of the two … removal cases" "Defendant DHS has reopened" "[s]ince the DHS Memo's pause on removals was enjoined."  *Id.* at ¶¶89-90.  The allegations do not even establish whether the post-injunction call volume was higher than that experienced under the Trump Administration prior to January 20.  Additionally, the greater call volume cited appears to be due to Puente's "members' fears of impending removal proceedings."  *Id.* at ¶ 88.  Puente's enhanced workload due to its members feelings of uncertainty about changes in immigration law at the time of a change in presidential administration is a direct effect of the "independent action of some third party" or parties not traceable to the Attorney General's actions.  *Lujan*, 504 U.S. at 560.

Plaintiff CPLC complains that "the Trump Administration's Public Charge Rule placed a substantially greater burden on green-card applicants" which "forced CPLC's staff to spend approximately three additional hours per client."  Compl. at ¶ 97.  The only action the Attorney General is alleged to have taken regarding CPLC's claimed injuries (*id.* at ¶¶ 94-104) is filing "a motion to intervene in a pending Ninth Circuit proceeding seeking to reinstate the rule" after the Biden Administration stopped enforcing it.  *Id.* at ¶ 98.  Here, CPLC attributes any actual injury to the effects of a policy created by the Trump Administration and can only complain that the Attorney

General has attempted to intervene in a suit brought by another party in order to get a court's determination of whether that policy was properly discontinued.

Plaintiff FIRRP cannot even point to any actual action taken by the Attorney General to cause its alleged injuries. *Id.* at ¶¶ 105-113. It claims that "FIRRP has expended considerable resources in anticipation of the Biden Administration's rolling back the [Migrant Protection Protocols] in Arizona" including hiring "an additional, full-time staff member." *Id.* at ¶ 110. These are self-imposed costs wholly independent of the Arizona Attorney General. FIRRP names two actions by Arizona that it claims lead to its injuries: (1) a "letter to Defendant Mayorkas condemning the 'repealing [of] the [MPP]'" by "Arizona's Governor, Doug Ducey," and (2) "Arizona has sued to enjoin the DHS Memo's pause on removals, indicating its intent to aggressively enforce its purported rights under the SAFE Agreement." *Id.* at 111. But Arizona's governor is not a party to this case, nor can a letter expressing his opinion directly cause an allegedly injurious change in federal policy. And it is notable that, while FIRPP references the lawsuit described in paragraphs 80-81 of the Complaint, that lawsuit has nothing to do with the MPP, the only immigration policy to which FIRPP attaches its claims. Other than its fear that the Attorney General *might* act on an "intent to aggressively enforce" his rights through the courts, FIRPP has no basis for alleging any injury from Defendant Brnovich.

Plaintiffs may not use this auxiliary challenge to interfere with proceedings before another court. The Complaint not only fails to establish any direct means by which the Attorney General's actions have caused their injuries, it provides the facts of alternative, direct causes of these same injuries, often involving the actions of third parties or even the Plaintiffs' choices, themselves. At best, the Complaint alleges prospective injuries that would only come to pass if (1) the SAFE Agreement is unlawful, and (2) the Attorney General nevertheless obtains a federal court judgment that enforces the SAFE Agreement's terms.

1    But, among myriad other problems, this allegation is self-defeating, for if a
2  federal court rules that the SAFE Agreement is enforceable and so orders it to be
3  enforced, then it cannot have been an unlawful agreement in the first place and so the
4  Attorney General would not be wrong for enforcing it.  Nevertheless, the Attorney
5  General's claims in the cases Plaintiffs describe are not for the specific performance of
6  the SAFE Agreement, nor does the Complaint establish that they are, and so even that
7  prerequisite is absent.  Instead, this suit is an improper attempt to increase the Attorney
8  General's costs of bringing separate challenges under the Administrative Procedure Act
9  to federal policy changes where Plaintiffs believe the changes benefit them.  Thus,
10  Plaintiffs fail to satisfy the second *Lujan* requirement for standing.

11        **d.  A Favorable Decision Here Cannot Redress Plaintiffs' Alleged
              Injuries Stemming From Decisions Of Other Federal Courts**
12

13    Even if Plaintiffs were to prevail here, such a judgment would not redress their
14  alleged injuries.  As this Court recently noted, "[r]edressability in this context means
15  that 'it must be likely, as opposed to merely speculative, that the injury will be redressed
16  by a favorable decision.'" *CDK Global LLC v. Brnovich*, No. CV-19-04849-PHX-GMS,
17  2020 WL 1640444, at *2 (D. Ariz. Apr. 2, 2020) (quoting *Planned Parenthood Ariz., Inc. v.
18  Brnovich*, 172 F. Supp. 3d 1075, 1086 (D. Ariz. 2016)).  As discussed above, Plaintiffs'
19  claims that they would be injured are contingent upon the Attorney General obtaining
20  a favorable judgment—and one based on the SAFE Agreement—in either this Court
21  or before the Ninth Circuit in one of the separate cases described in the Complaint.  *See*
22  Compl. at ¶¶ 80-82.  Yet this case does not present the same issues as *Arizona v. DHS*,
23  No. 2:21-cv-00186-SRB, and so this Court would not have the opportunity to directly
24  overrule any judgment obtained in that case, even if it were so inclined.  Nor would this
25  Court have authority to countermand a judgment by the Ninth Circuit in *City & Cnty. of*
26
27
28

                                          9

*San Francisco v. U.S. Citizenship & Immigr. Servs.*, No. 19-17213. Review of *this Court's* judgments is vested in the Ninth Circuit.  Not the other way around.

This is not a matter of Plaintiffs' attempts to intervene or appear as amici in the cases the Complaint says will actually affect their rights, but one of whether they can bring a wholly separate case in order to stop the effects of other ongoing federal proceedings.  As the issues of those cases are not litigated here, it would be impossible for Plaintiffs' favorable judgment here to redress their alleged injuries.  Therefore, Plaintiffs fail to meet the core requirement of redressability as well.

## II.   Plaintiffs' Claims Should Be Dismissed As Moot

Additionally, Plaintiffs' claims are prudentially moot now and will soon be constitutionally moot under Article III as well.  *E.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (U.S. CONST., art. III, § 2 "demand[s] that an actual controversy … be extant at all stages" of litigation) (internal quotation marks omitted).  Defendants have not operationalized the SAFE Agreement and Plaintiffs cannot point to any specific use or enforcement of the agreement leading to their alleged injuries.  As DHS has confirmed it will not be altering its policies based on the SAFE Agreement going forward, either, there is no opportunity for such an injury to occur and Plaintiffs' claims are therefore moot.  *See*, Pekoske Letter, Ex. D.

### a.  The SAFE Agreement Will Expire In Days

DHS gave notice of termination of the SAFE Agreement on February 2, 2021, triggering the 180-day termination provision within the agreement.  SAFE Agreement, Ex. A; Pekoske Letter, Ex. D.  This gives an official termination date of August 1, 2021, by the SAFE Agreement's own terms. Upon that date, there will be no way for the Plaintiffs to suffer the prospective harms they allege may occur should the Attorney General attempt to enforce the SAFE Agreement.

### b.  Plaintiffs' Claims Are Prudentially Moot

And while the official termination date has not yet occurred, Plaintiffs' claims are prudentially moot as a SAFE Agreement that DHS has expressed no intention of complying with, even while technically active, has no practical significance to Plaintiffs. "The doctrine of prudential mootness permits a court to 'dismiss an appeal not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief[.]'" *Deutsche Bank Nat. Tr. Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014).

Prudential mootness reflects the common-sense recognition that, "if events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012).  And courts of appeal nationwide that have considered the issue have concluded that actions (such as this one) seeking only declaratory and equitable relief— *i.e.*, *discretionary* relief—can properly be dismissed as moot on prudential grounds, even if the case is not moot within the meaning of Article III.  *See, e.g.*, *Ard v. FDIC*, No. 09-4115, 2010 U.S. Dist. LEXIS 25113, at *19-20 (C.D. Cal. Mar. 17, 2010) ("The prudential mootness doctrine has been adopted by the First, Third, Fourth, Fifth, Sixth, Eighth, Tenth, and D.C. Circuits; no circuit or district court has rejected it.") (collecting cases).

The SAFE Agreement has not been—and, by all indications, will *never* be— operationalized. It will thus soon fade from being (1) practically irrelevant and affecting no one, into (2) a formal nullity, which still tangibly affects no one. The dispute that Plaintiffs attempt to pose about the SAFE Agreement's validity thus lacks any practical significance now, and is thus prudentially moot given the Federal Defendants' prompt disavowal and the rapidly approaching formal mootness. And whether dismissed as

prudentially moot now, or constitutionally moot with a few weeks (or less) of the

motions to dismiss being fully briefed, the ultimate result here is not in doubt: dismissal

under Rule 12(b)(1) is inevitable.

**CONCLUSION**

For the reasons above, the Court should dismiss Plaintiffs' Complaint.

RESPECTFULLY SUBMITTED this 14th day of June, 2021.

MARK BRNOVICH
ATTORNEY GENERAL

By */s/   Anthony R. Napolitano*
ANTHONY R. NAPOLITANO (NO. 34586)
*Assistant Attorney General*
OFFICE OF THE ARIZONA ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Facsimile: (602) 542-8308
ACL@azag.gov
Anthony.Napolitano@azag.gov

*Attorneys for Defendant Mark Brnovich,*
*in his official capacity as Attorney General of the State of*
*Arizona*

12

1

## <u>CERTIFICATE OF SERVICE</u>

2
3       I hereby certify that on this 14th day of June, 2021, I electronically transmitted

the foregoing document to the Clerk's Office using the CM/ECF system, which will
4       send a notice of filing to all counsel of record.

5
6                                                    */s/  Anthony R. Napolitano*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
28